UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                             CASE NO. 3:07-cr-263-J-32HTS

JASON ISAAC THOMPSON

**GOVERNMENT'S OPPOSITION TO
DEFENSE MOTION TO SUPPRESS**

The United States of America, by Robert E. O'Neill, United States Attorney for the Middle District of Florida, hereby submits its opposition to the defendant's suppression motion. Dkt. No. 59. For the reasons set forth herein, the Court should deny the motion.

**I.    Procedural Background**

The Defendant was first charged by criminal complaint on September 21, 2007 with delivering a package containing a firearm to a common carrier for transportation and shipment in interstate commerce to a person other than a licensed importer, manufacturer, dealer, or collector, without written notice to the common carrier that the firearm was being transported and shipped, in violation of Title 18, United States Code, Sections 922(e) and 924(a)(1)(D). Dkt. No. 1 (Matter No. 3:07-mj-1223-MCR). A superseding indictment charging the same offense later followed. Dkt. No. 38.

**II.   Facts**

The United States expects the Court's hearing on the defense motion to establish the following:

On September 20, 2007, the defendant was booked on Southwest Airlines flight no. 54, scheduled to departure Jacksonville International Airport at 5:55 p.m., bound for Houston's Hobby Airport, with a return flight to Jacksonville booked for the following day.  The defendant arrived at the airport, and walked to the Southwest ticket counter, passing multiple conspicuous signs indicating that all firearms in checked luggage must be declared to the airline.  Indeed, the defendant well knew of this procedure, having made multiple recent overnight trips to Houston on Southwest Airlines in which he properly declared firearms in checked luggage.  However, on this occasion, he did not indicate to the Southwest Airlines ticket counter agent, Donna Woods, that there were firearms within his checked luggage.

The defense motion says that the defendant obtained a firearms declaration tag from Southwest counter personnel, but the assertion is demonstrably false.  Southwest personnel do not distribute the tags to passengers, but instead require them to be filled out and placed in luggage in the counter agent's presence.  Moreover, the tag later found within the defendant's checked luggage was an old version of the tag used by Southwest Airlines, clearly left over from some previous flight.  On September 20, 2007, the JIA Southwest Airlines ticket counter had none of the old forms in use; employees were using the updated form instead.

The defendant obtained his boarding pass and left for the gate, and his bag went via conveyer belt to the Transportation Security Administration ("TSA") screening area, where all bags are x-rayed pursuant to established procedures and statutory authority. In the x-ray image, the TSA screener, Richard Wilson, observed an interior case containing with firearms and loaded magazines.  Contrary to defense assertions, the

TSA screener could not ascertain merely from the x-ray image whether the firearms and ammunition were being transported safely, in compliance with TSA regulations. Cf. Defense Motion at 4. First, the firearms were semiautomatic firearms, packed with their slides and chambers closed, so each could well have been loaded with a live round in the chamber.[1] See 49 C.F.R. 1540.111(c)(1). Second, in the x-ray image the ammunition appeared not to be transported safely and in compliance with TSA regulations. See 49 C.F.R. § 175.10(a)(8) (indicating that small arms ammunition must be securely packed in boxes or other packagings specifically designed to carry small amounts of ammunition, and that ammunition clips and magazines must also be securely boxed). Instead, the clips were lying unboxed and loose within the case, with the top live round exposed. Third, the metal frames firearms and metal shells of the ammunition prevented the x-rays from penetrating beneath the firearms and ammunition, so what (if anything) was packed underneath could not be ascertained merely from the x-ray image. Accordingly, an inspection of the contents of the defendant's luggage was absolutely indicated, solely for purposes of air safety, and the defendant's gun case needed to be opened.

The fact that this was a TSA administrative search for safety cannot be overemphasized. TSA officers are not law enforcement officers, and they are only trained to look for potential hazards to flight safety. They are not trained to look for contraband or evidence of unrelated crimes. The search at issue was solely for

---

[1]This is a common mistake made with this type of firearm, and one often resulting in tragic accidental shootings. A user will remove the clip, believing the firearm to be unloaded, but a round will remain in the chamber. TSA regulations are designed to protect against such accidental discharges within aircraft cargo holds.

legitimate TSA purposes.

However, for safety purposes TSA screeners do not handle firearms. Instead, TSA relies on Jacksonville Aviation Authority police officers, who are of course law enforcement officers trained in the handling of firearms, for that purpose. So, Officer Walter McLanahan was requested to assist.

The defendant's luggage was opened. Inside the luggage, there was a locked gun case with an undated firearms declaration form taped to the outside.[2] The form appeared to the TSA officer to be old one. TSA supervisor Eugene Wellborn was notified, and he contacted the Southwest Airlines ticket counter and ascertained that the defendant had not declared to the airline that there were firearms in his checked luggage. TSA then asked the defendant to come to the TSA "CTX" room, so that the luggage could be opened.

When the defendant arrived at the TSA location, the defendant stated that the luggage and the firearms within were his, and he lied that he had in fact declared the firearms to a Southwest ticket counter employee, but that he could not remember which one. Officer McLanahan asked the defendant to unlock the gun case, but the defendant said he could not do so, because the key was in his girlfriend's car. Officer McLanahan and another officer then escorted the defendant to the parking lot so the key could be retrieved. Once within the car, the defendant produced the key, but Officer McLanahan

---

[2]The use of tape strongly confirms that the defendant did not obtain the declaration tag from the ticket agent, but instead secretly used an old one from a previous flight. Southwest ticket agents do not tape the tags, but instead leave them loose within the luggage. No roll of tape was observed in the defendant's luggage or on his person.

believes the key was on the defendant's person the entire time.³

Back at the CTX room, the defendant's locked gun case was opened with the key, and the officers inspected the firearms to make sure they were not loaded. The officers also noted the serial numbers of the firearms, which were plainly visible on the frames, and they conducted a quick telephonic check to make sure they were not reported stolen. Officer McLanahan then attempted to place the firearms back in the defendant's gun case and close the case, but the case would not close. The dimpled foam padding within the case was too raised. The defendant tried to help Officer McLanahan close the case, without immediate success. Officer McLanahan then looked under the foam to see what the problem was. Officer McLanahan immediately observed a large amount of cash stacked under the foam, in bundles of various denominations.⁴ The cash was later counted to amount to approximately $63,000. The defendant had another approximately $5,000 on his person.

Carrying large amounts of cash, especially in close connection with firearms, is a well-known indicator of a subject's participation in an illegal market, such as trafficking in drugs or other contraband. At that point, it became apparent that the defendant's

---

³Officer McLanahan is undoubtedly right. The defendant and his girlfriend resided at separate addresses, drove separately to the airport, and they checked in separately. It makes little sense that the key to the defendant's luggage was in the girlfriend's car. Moreover, if the key were to remain in the JIA parking lot in the girlfriend's car, then the firearms would be inaccessible in Houston, defeating the purpose of the defendant transporting them in the first place.

⁴The locked case was designed to carry firearms or other sensitive equipment, with dimpled foam padding specifically fitted within. The foam padding was designed to fit flush against the shell of the case, and concealing the cash underneath the foam raised the foam too much, cause the difficulty in closing it.

failure to declare the firearms was not inadvertent, the decision was made to arrest and charge the defendant.

## III.     Points and Authorities

### A.     Administrative Search Exception

The United States agrees that there was a search of the defendant's luggage, and that the search was not done pursuant to a warrant. Therefore the search will be upheld only it walls within one of the established exceptions to the warrant requirement. U.S. Const. Amend. IV.; Minnesota v. Dickerson, 508 U.S. 366, 372-73 (1993). However, the defense motion errs when it asserts that the only relevant exception is the "investigative detention" exception established by the Supreme Court's Terry decision, which must be supported by "reasonable suspicion." Terry v. Ohio, 392 U.S. 1, 20-21 (1968). Airport screening is mandatory and conducted pursuant to statutory authority, 49 U.S.C. § 44901, and Title 49 of the Code of Federal Regulations. Thus, as set forth below, the search here falls squarely within the administrative airport "check point" search exception.

One case notably absent from the defendant's motion is United States v. Hartwell, 436 F.3d 174 (3d Cir. 2006).[5] In Hartwell, Judge (now Associate Justice) Alito, writing for a unanimous panel, considered the precise substantive situation presented here – a "suspicionless checkpoint search" at an international airport. The Court noted that the Supreme Court has repeatedly held that suspicionless checkpoint searches are

---

[5] The most recent Circuit-level analysis of these issues appears to be United States v. Aukai, 497 F.3d 955 (9th Cir. 2007) (en banc), which is utterly in accord with Hartwell.

permissible when a court finds a favorable balance between "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Id. at 178-79, quoting Illinois v. Lidster, 540 U.S. 419, 427 (2004), and Brown v. Texas, 443 U.S. 47, 51 (1979).

The Hartwell court held that airport searches absolutely pass Fourth Amendment muster under that three-part test. First, the court noted, preventing terrorist attacks is of "paramount importance" at airports, especially following the terrorist atrocities of September 11, 2001. Id. at 179 (citations omitted). Second, airport checkpoints advance the public interest, because there is no effective way of limiting the searches to only those persons likely to hijack or attack an aircraft. Id. at 197-80 (citations omitted). Third, airport searches are minimally intrusive and well-tailored to protecting personal privacy, "escalating in invasiveness only after a lower level of screening disclose[s] a reason to conduct a more probing search." Id. at 180 (citations omitted). The court further emphasized that every passenger goes through such screening, so no stigma attaches, and also that passengers choose to fly and have been on notice of screening procedures since at least 1974, and most certainly since September 11, 2001. Id. at 180-81 (citations omitted).

Hartwell dealt with contraband drugs and cash found on a subject's person, but the Hartwell decision expressly applies to the screening of luggage as well. See Id. at 181, citing with approval United States v. Pulido-Baquerizo, 800 F.2d 899, 901 (9th Cir. 1986) (holding that travelers who put their luggage on a conveyer belt impliedly consent to x-ray scan, visual inspection, and hand search of the luggage).

7

Hartwell concludes that warrantless airport searches, done entirely without individualized suspicion, do not offend the Fourth Amendment, because "the State has an overwhelming interest in preserving air travel safety, and the procedures are tailored to advance that interest while proving to be only minimally invasive. . . ." Id. at 181. Moreover, the fact that other evidence is found besides explosives does not matter, because the search is proper. Id. at 181, n. 13. Other circuit case law is entirely in accord. See United States v. Marquez, 410 F.3d 612, 617-18 (9th Cir. 2005); United States v. Cyzewski, 484 F.2d 509, 512 (1973) ("The courts have consistently held that airport security measures constitutionally justified as a limited and relatively insignificant intrusion of privacy balanced against the need to protect aircraft and passengers.")

The defense motion says that the gun case could not be opened without a warrant, and it cites four cases for that astounding proposition. But each case is clearly inapposite. In the first, United States v. Place, at issue was a search that occurred after the subject had reached his destination airport, retrieved his luggage, and was waiting for a limousine! Place, 462 U.S. 696, 698 (1983). Obviously any airport screening was long over with, and no flight safety rationale could be operative. In the second, Florida v. Royer, the defendant's luggage had already gone through airport screening procedures when it was removed from the aircraft itself by narcotics detectives. Royer, 460 U.S. 491, 493-95 (1983). Again, the search at issue had nothing to do with security screening. The third authority relied on by the defense, United States v. Palazzo, 488 F.2d 942 (5th Cir. 1974), is the same as Royer. Again, the luggage had already gone through airport screening procedures; law enforcement removed it from the aircraft itself right before takeoff. Palazzo, 488 F.2d at 944. Finally, the last case cited, United

8

States v. Garay, 477 F.2d 1306 (5th Cir. 1973), is the same as Royer and Palazzo. United States Customs Service agents investigating drug smuggling had checked luggage removed from an aircraft after the luggage had already gone through screening; the contraband was not discovered during the screening itself. Garay, 477 F.2d at 1307-08.

  **B.** **Consent**

Page 13 of the defense motion asserts that "Mr. Thompson" did not voluntarily consent to the search of his locked silver gun box. However, consent is simply not part of the Court's inquiry in determining the validity of an administrative search. United States v. Aukai, 497 F.3d 955, 960-61 (9th Cir. 2007).

Regardless, the defense motion notwithstanding, the defendant did so consent, the moment he handed the bag over to Southwest Airlines to be placed on the conveyor belt and thereafter in the aircraft. United States v. Herzbrun, 723 F.2d 773, 776 (11th Cir. 1984); see also Hartwell, 436 F.2d at 181 (citations omitted); United States v. Pulido-Baquerizo, 800 F.2d 899, 901 (9th Cir. 1986) ("in light of the circumstances surrounding today's airport checkpoints, travelers who put their belongings on a conveyor belt impliedly consent" to x-ray scan, visual inspection, and hand search of the luggage).

Moreover, at the point the die is cast, and there is no longer any right to withdraw consent. Herzbrun, 723 F.2d at 776 (to hold otherwise would "constitute a one-way street for the benefit of a party planning airport mischief"); Torbet v. United Airlines, 298 F.3d 1087, 1089 (9th Cir. 2002) ("To avoid search, a passenger must elect not to fly before placing his bag on the x-ray conveyor belt."); Hartwell, 436 F.2d at 181, n. 12

(collecting cases); Aukai, 497 F.3d at 960-61 ("requiring that a potential passenger be allowed to revoke consent makes little sense in a post 9/11 world").

### C. Scope of Search

Having established that TSA can conduct administrative searches of luggage to be placed on commercial aircraft, the question remains whether the scope of the search of the defendant's luggage was reasonable. The requirement is that the screening be "no more extensive or intensive than necessary." United States v. Marquez, 410 F.3d 612, 616 (9th Cir. 2005); Aukai, 497 F.3d at 962; Cyzewski, 484 F.2d at 513 (search may continue until official is satisfied as to safety); United States v. Lopez-Pages, 767 F.2d 776, 778 (11th Cir. 1985) (additional search may be done if concerns not allayed by routine security check).

As discussed above, the search at issue here was of reasonable scope. The x-ray image by itself could not conclusively tell whether the firearms and ammunition were being transported safely in compliance with TSA regulations. Without opening the case and handling the firearms, there was no telling whether one or both guns were loaded with a live round in the chamber. Further, the x-ray itself revealed a concern that the ammunition was not packaged safely and in compliance with TSA regulations. See 49 C.F.R. § 175.10(a)(8) (indicating that small arms ammunition must be securely packed in boxes or other packagings specifically designed to carry small amounts of ammunition, and that ammunition clips and magazines must also be securely boxed). Again, the clips were lying unboxed and loose within the case, with the top round exposed. Finally, the metal frames firearms and metal shells of the ammunition prevented the x-rays from penetrating beneath the firearms and ammunition, so what (if

anything) was packed directly underneath could not be ascertained from the x-ray image. Under these factual circumstances, TSA was absolutely justified in opening the case and in looking under the dimpled foam padding.

### D.     Detention of Thompson

Eleventh Circuit law is clear that the delay of a passenger while going through airport security procedures is not tantamount to custody. United States v. Vigil-Montanel, 753 F.2d 996, 998 (11th Cir. 1985). The requirement is that the process not be unduly prolonged beyond the time necessary to accomplish the purposes of legitimate screening. Aukai, 497 F.3d at 963. Here, the evidence will show that the screening took only as long as reasonably necessary to ensure that the contents of the defendant's luggage were not a threat to aircraft safety. Indeed, the defendant brought most of the delay upon himself, with his ruse that he left the key in his girlfriend's car. The United States concedes that the defendant was under arrest and detained once the cash was found. However, at that point he invoked his right to counsel, and all questioning properly ceased.

### E.     Search Warrant

The defense motion also seeks suppression of evidence obtained pursuant to the execution of a search for the defendant's luggage and cellular telephone issued by Judge Richardson.

The Fourth Amendment requires that an impartial judicial officer assess whether there is probable cause to conduct a search and to seize evidence, instrumentalities, fruits of a crime, or contraband. See United States v. Martin, 297 F.3d 1308, 1316-18 (11th Cir. 2002) (magistrate must be "neutral and detached"); Warden v. Hayden, 387

U.S. 294, 301-02 (1967). The magistrate considers the facts and circumstances presented in the application and supporting affidavit in a practical, common-sense manner to make the determination of probable cause. Fed.R.Crim.P. 41(d) (discussing probable cause requirement, affidavit); Illinois v. Gates, 462 U.S. 213, 218 (1983). Statements in an affidavit are not supposed to be read in isolation; instead, the affidavit is to be considered as a whole, with common sense. See United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000); Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998). The evidence within an affidavit merely must provide the magistrate with a "substantial basis" for the probable cause determination. Gates, 462 U.S. at 238-39.

Unlike determinations of reasonable suspicion or probable cause in the context of warrantless searches and seizures, which are reviewed de novo, a magistrate's decision to issue a warrant must instead be reviewed with great deference. Ornelas v. United States, 517 U.S. 690, 696 (1996). see also United States v. Mathis, 357 F.3d 1200, 1205 (10th Cir. 2004) (magistrate's determination of probable cause given great deference and reviewed only to ensure there was a substantial basis for the determination).

Finally, affidavits supporting warrants are presumed valid, and the party seeking suppression bears the burden of showing any omission within the affidavit was more than negligent. Franks v. Delaware, 438 U.S. 154, 171 (1978); United States v. Van Horn, 789 F.2d 1492, 1500 (11th Cir. 1986). Where, as here, the defendant alleges intentional misleading of a magistrate, he must make a two-fold showing for his motion to suppress to be granted. First, he must make a substantial preliminary showing, by a preponderance of the evidence, "that a false statement knowingly and intentionally, or

with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Franks, 438 U.S. at 155.  Second, he must show that after setting aside any such misstatements and omissions, there would not be probable cause for the search warrant.  Id. at 171-72.

The defense motion essentially asserts that there were material omissions and falsehoods in the affidavit in support of the warrant (e.g. the defense assertion that the defendant did notify Southwest Airlines that there were firearms within his checked luggage, and other facts in dispute).  The United States respectfully submits that, at the hearing on the defense motion, the defense will not be able to meet its burden of making the requisite "substantial preliminary showing" of any material omissions or falsehoods.

**IV.   Conclusion**

For the reasons set forth above, the Court should deny the defense motion, following its hearing on the motion.

> Respectfully submitted,
>
> ROBERT E. O'NEILL
> United States Attorney
>
>
> By:   *s/ John J. Sciortino*
>       JOHN J. SCIORTINO
>       Assistant United States Attorney
>       USAO No. 079
>       300 North Hogan Street, Suite 700
>       Jacksonville, Florida  32202-4270
>       Telephone:   (904) 301-6300
>       Facsimile:   (904) 301-6310
>       E-mail:       john.sciortino@usdoj.gov

U.S. v. Jason Isaac Thompson                              Case No. 3:07-cr-263-J-32HTS

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

>Charles B. Lembcke
>cbl@cbllaw.com
>Attorney for Defendant Thompson

>*s/ John J. Sciortino*
>JOHN J. SCIORTINO
>Assistant United States Attorney
>USAO No. 079
>300 North Hogan Street, Suite 700
>Jacksonville, Florida  32202-4270
>Telephone:   (904) 301-6300
>Facsimile:   (904) 301-6310
>E-mail:      john.sciortino@usdoj.gov