**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                    CASE NO.:  3:07-cr-263-J-32HTS

JASON ISAAC THOMPSON

────────────────────────

**REPORT AND RECOMMENDATION**[1]

**I.  Status**

    This cause is before the Court on Jason Isaac Thompson's
Corrected Motion to Suppress Evidence from Warrantless Search and
Seizure and Subsequent Execution of Search Warrant (Doc. #59;
Motion), filed on January 7, 2008.[2]   The government filed
opposition in response to the Motion on February 10, 2008.  *See*
Government's Opposition to Defense Motion to Suppress (Doc. #66).
An evidentiary hearing was held before the undersigned on February

─────────────────

    [1]    Specific, written objections may be filed in accordance with 28
U.S.C. § 636 and Rule 6.02, Local Rules, United States District Court, Middle
District of Florida, within ten (10) days after service of this document.
Failure to file timely objections shall bar the party from a *de novo*
determination by a district judge and from attacking factual findings on appeal.

    [2]    To the extent the return of property is sought, *see*, *e.g.*, Motion at
1, 9, such request should be made by way of a separate, future filing.  At the
time the instant motion was filed, Defendant represented he had no "inventory of
items seized" pursuant to a search warrant.  *Id.* at 6.  At the hearing, the
government was directed to ensure Mr. Thompson receives a copy of that inventory,
as well as a listing of anything else taken from him.  Once such is accomplished,
the parties should attempt to amicably resolve whether some of the property ought
to be returned.

19-20, 2008, and a supplemental hearing took place on March 4, 2008.

## II. Background

The events at issue took place at Jacksonville International Airport (JIA) on September 20, 2007.  On that date, at around 5:30 or 5:40 p.m., CTX operator Richard Lee Wilson had his attention drawn to the image of a particular piece of checked luggage that had set off the machine's shield alarm, which indicated not everything in the suitcase was susceptible to viewing.  The image revealed firearms within the luggage were responsible for the shielding, and Mr. Wilson was unable to determine whether the guns were loaded.  He sent the bag, which had been checked in connection with a flight bound for Texas, on to the resolution room for further inspection.

The bag was opened and, as it was determined the weapons had not been declared properly to the airline, Transportation Security Administration (TSA) Supervisor Eugene Dwaine Wellborn, Jr., became involved.  He was told there was a bag containing weapons in a locked case, but that "the declaration [contained in the bag] was not dated." Transcript of Suppression Hearing (Tr.) at Vol. 1, 66. Mr. Wellborn inquired twice with the ticket counter personnel and was informed the firearms had not been declared to the airline.  He then had the affected passenger, the Defendant herein, paged.  The lack of a proper declaration raised safety concerns and played a

- 2 -

role in the decision to take this further action although, had the weapons been declared, Mr. Wellborn might have still asked for the passenger to come and open the case.   Additionally, he called the police for assistance in light of their expertise in handling weapons.   Mr. Wellborn testified that, upon Defendant's arrival in the resolution room, Mr. Thompson claimed "that he did declare the weapon[.]"   *Id.* at Vol. 1, 75.

Donna Woods, the ticket agent who assisted Defendant with checking his baggage, confirmed to her supervisor that evening that Mr. Thompson had not mentioned anything about guns.  A declarations log kept at the ticket counter also failed to list any such disclosure.  Ms. Woods specifically remembered checking Defendant in, as he had attempted to check his bag under a name other than his own.   Had he told her about the firearms, she would have required him to show them to her and affirm they were unloaded. She would also have checked to be sure the ammunition was packaged properly.  Finally, she would have completed a declaration tag, had the passenger fill in his address, and instructed him to "read the directions on the back that [state he is] declaring the weapon and also that the weapon is not loaded."  *Id.* at Vol. 1, 137.

Ms. Woods proceeded to an office near the resolution room, where in response to questioning by TSA agents she described her interactions with Defendant, including his attempt to check his luggage under someone else's name.   She "then . . . saw the police

bringing Mr. Thompson in to" the resolution room where the weapon was located, and she was brought to that room as well. *Id.* at Vol. 1, 135.  She observed that a declarations tag was taped on a gun box inside the soft-sided suitcase, but the tag was not the most recently revised version, which had been in exclusive use since August 2006.

Around 5:40 or 5:45 p.m. of the evening in question, Officer Walter Harold McClanahan of the Jacksonville Aviation Authority Police Department received a call about the allegedly undeclared firearms.  When Officer McClanahan arrived in the resolution room, he was shown the scan of a soft-sided bag in which there appeared to be a metal case containing two guns and ammunition.  He could not tell whether the firearms were loaded.  Defendant, escorted by two airline employees, entered the room within about ten minutes of McClanahan's arrival.  TSA personnel asked that the case be opened, but Mr. Thompson indicated the key was in a vehicle belonging to his traveling companion.  Therefore, Officer McClanahan and another policeman obtained the owner's consent to search the car and escorted Defendant to the hourly airport garage where it was parked.  During this period, and actually anytime after he entered the resolution room pending clearance of the matter, Defendant would not have been permitted to leave.

Defendant having entered the vehicle and emerged with the key, the three men returned to the resolution room.  Mr. Thompson opened

the case, then was asked to step back while Officer McClanahan
searched the weapons and verified they were not loaded.  There were
gun locks in place; however, such locks would not necessarily
prevent discharge of a loaded weapon in the event it was jostled or
struck.  The officer ran a serial number check, as a matter of
course, to confirm the legal status of the pistols.  At that point,
an attempt was made to return the box to a closed position, but
something prevented this from being accomplished.  Defendant
offered to assist, but for safety's sake he was asked to step back.
The case was opened up again and "a bulged area" of loose foam was
noticed.  *Id.* at Vol. 1, 179.  Just underneath the foam lay a large
sum of currency, which inspection of this part of the case
revealed.   The time was now approximately 6:30 or 6:40 p.m.
Although at 5:58 p.m. Defendant had been removed from the list of
passengers scheduled to depart on the original flight, there was
another plane leaving at about 7:00 or 7:30 p.m. by which he could
have proceeded toward his intended destination--had he not been
detained subsequent to discovery of the currency.

### III.  Summary of Argument

The Motion states the Court is being asked

    for entry of an order suppressing: (a) all statements
    made by Mr. Thompson; (b) the seizure of all physical
    items from Mr. Thompson, including but not limited to his
    luggage, the silver TSA approved locked gun box and its
    contents, his cell phones and all other personalty taken
    from him; and (c) all evidence seized pursuant to the
    execution of the Search Warrant upon luggage, guns,

cellular phones of Jason Isaac Thompson, along with any
fruits thereof[.]

Motion at 1.   In regard to the evidence Defendant desires
suppressed, the government clarified at the hearing that it will
seek to introduce at trial, as part of its case in chief, only the
contents of the gun case and Defendant's statement(s) to the effect
the firearm(s) had been declared.   Nothing that was the subject of
the search warrant will be relied upon at trial.   Accordingly, the
arguments pertaining to the search warrant have been rendered moot.

### IV.  Analysis

**A.  Statement(s)**

It is asserted "[t]he statements made by Mr. Thompson were
obtained in violation of his constitutional rights and *Miranda* [*v.
Arizona*, 384 U.S. 436 (1966)]."  Motion at 8.  Because this issue
was not further developed or discussed in Defendant's memorandum or
oral argument, the Court is unsure whether Mr. Thompson intends to
pursue the challenge or has abandoned it.   Notwithstanding this
uncertainty, the issue will be addressed.

"Generally, on a motion to suppress, the defendant has the
burden of proving, by a preponderance of the evidence, that the
evidence in question was obtained in violation of [his]
constitutional rights."  *United States v. Guerrero-Barajas*, 240
F.3d 428, 432 (5th Cir. 2001) (citing, inter alia, *United States v.*

*de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)).[3] If, though, "a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination." *de la Fuenta*, 548 F.2d at 533; *see also United States v. Cary*, No. 1:07-cr-74-WSD, 2008 WL 80650, at *17 (N.D. Ga. Jan. 4, 2008) (citing *de la Fuenta* for the proposition that "[t]he defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning").

The determination of whether an individual was in custody follows a two-part test: "'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The hearing testimony describes a single statement of the type the government wishes to introduce at trial. Nonetheless, the record fails to establish Defendant was in a custodial situation requiring the administration of *Miranda* rights or being subjected to governmental interrogation at the time the statement occurred.

---

[3]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the Fifth Circuit prior to October 1, 1981.

According to Supervisor Wellborn, Defendant said "that he did declare the weapon" and that this remark was made upon Mr. Thompson's arrival in the resolution room. Tr. at Vol. 1, 75. The specific circumstances of this utterance are far from clear. One witness testified the police brought Mr. Thompson to the room. Another asserted he was escorted by airline employees. One of these accounts might be inaccurate, or both may simply be incomplete--perhaps Defendant was accompanied by both police officers and airline workers at the moment he made the statement. Further, while it is plausible the verbalization occurred in response to questioning or its functional equivalent, exactly who or what prompted it has not been established. The customer service supervisor for the airline testified he told Mr. Thompson "he needed to come down with [him] to talk to TSA about his weapon." *Id.* at Vol. 2, 25. Defendant, who was on his cell phone, said nothing in response and continued talking on the phone "for the majority of the [two or three minutes they] were walking down." *Id.* Up to this point, the encounter appears to have proceeded in a very casual and nonthreatening manner.

A de facto arrest does not necessarily occur the moment an individual enters a room beyond the public area of an airport. *See, e.g., United States v. Okelley*, 106 F. App'x 577, 578 (9th Cir. 2004) (pre-*Miranda* statements made subsequent to being "led to the airport police office" admissible); *United States v. McDonald*,

No. A05-065 CR (JWS), 2005 WL 2453156, at *3 (D. Alaska Sept. 30, 2005) (noting that, in *United States v. Knox*, 839 F.2d 285 (6th Cir. 1988), it was held that travelers detained at an airport were not in custody "by virtue of the fact that the agents escorted them to the airport security office and then questioned them separately"); *United States v. Maldonado-Espinosa*, 767 F. Supp. 1176, 1188 (D.P.R. 1991) (custodial arrest began when defendants handcuffed and read Miranda warnings, not when they cooperated with officials during "concourse/gate area discussions" or proceeded "to the Customs area of their own volition"). Additionally, just as the Eleventh Circuit "has analogized airport security searches to border searches for the purposes of fourth amendment analysis[,]" it has indicated "the analogy also applies for fifth amendment purposes." *United States v. Vigil-Montanel*, 753 F.2d 996, 998 n.3 (11th Cir. 1985) (citing, inter alia, *United States v. Herzbrun*, 723 F.2d 773 (11th Cir. 1984), which involved a domestic flight, for the former proposition). Therefore, it may be that any questioning herein must have "rise[n] to a distinctly accusatory level before it can be said" Mr. Thompson was placed in custody. *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996). In any event, as in *Moya*, here there is no evidence Defendant "was . . . physically moved or restrained by officers on the way to the scene of the interview." *Id.* at 1119. Nor has it been shown that, by the time the statement was made, handcuffs had been

employed, guns drawn, or Mr. Thompson told of formal accusations or that he was under arrest. *Cf. id.* Finally, it has not been established Defendant had asked to leave or made admissions "that would have led a reasonable person in his place to conclude that he would be arrested immediately." *Id.*

When he made the statement, Defendant, at most, had been subjected to a seizure similar to a *Terry*[4] stop in terms of duration and intrusiveness.[5] The testimony indicates that, but for the later discovery of a large sum of currency, the authorities expected Defendant might be allowed to proceed on his way once the guns had been inspected. Officer McClanahan testified that, even after discovering the money, he did not arrest Mr. Thompson. Rather, he had to "contact[] the federal authority" to determine whether they wished "to proceed with . . . the arrest." Tr. at Vol. 1, 196. While Defendant may have been in custody prior to the time Officer McClanahan would consider him arrested, there is certainly no evidence that, at the time the statement at issue was given, law enforcement had conveyed any intention of arresting him or conducting a prolonged detention. At the relevant stage of the encounter, then, in the absence of circumstances not here established, the restraint on Defendant's liberty cannot be found

---

[4]     *Terry v. Ohio*, 392 U.S. 1 (1968).

[5]     A *Terry* stop involves "a brief seizure or investigatory detention[.]" *Hardy v. Broward County Sheriff's Office*, 238 F. App'x 435, 440 (11th Cir. 2007) (per curiam).

to have been such as to require *Miranda* warnings.  It has not been
shown to have "involve[d] the type of 'highly intrusive' coercive
atmosphere that may require *Miranda* warnings even before a formal
arrest is made." *Acosta*, 363 F.3d at 1150.  Finally, nothing in
the record suggests the statement was coerced or otherwise
involuntary.  Mr. Thompson's statement, therefore, should not be
suppressed.

### B. Physical Evidence

According to Mr. Thompson, his "initial detention . . . was in
violation of *Terry*."  Motion at 8.  He argues "[t]here was nothing
to give a reasonable person reasonable suspicion that [he] was or
was about to commit criminal activity."  *Id.* at 11.  Defendant
further complains "[t]he search of the silver gun box was a
warrantless search without consent."  *Id.* at 8.

"It is beyond question that the government has a compelling
interest in intercepting drug couriers and preventing air piracy."
*United States v. McKennon*, 814 F.2d 1539, 1544 (11th Cir. 1987)
(per curiam) (footnote omitted).  Thus, the Eleventh Circuit "has
long held that airport security checkpoints, like international
borders, are 'critical zones' in which special fourth amendment
considerations apply." *United States v. Lopez-Pages*, 767 F.2d 776,
778 (11th Cir. 1985); *cf. Herzbrun*, 723 F.2d at 775 ("[A]irport
security checkpoints and loading gates are sui generis under the
fourth amendment.").

- 11 -

"Airport security measures are reasonable . . . insofar as they permit government agents to determine whether a suspect presents an immediate danger to air commerce." *United States v. Cyzewski*, 484 F.2d 509, 513 (5th Cir. 1973). Once begun, "[t]he search may continue until the law enforcement official satisfies himself that no harm would come from the passenger's boarding the plane." *Id.* In *Cyzewski*, the Eleventh Circuit upheld "the retrieval of checked baggage and the warrantless search of it over protest" since "at no point in the authorized security procedure did defendants' innocence become clear[.]" *Id.* at 514. Although emphasizing the threat of hijacking, the court did not find determinitive "the airborne passenger's inability to fetch any weapon that might be concealed in his checked baggage[.]" *Id.*

Defendant acknowledges "[e]ach and every checked bag at JIA is subjected to CT scanning." Motion at 3 (citing 49 U.S.C. § 44901(c) for the proposition that "all airports in [the] United States must have a system in operation to screen all checked baggage"); *see also id.* at 11. By statute, "the screening of all passengers and property, including . . . checked baggage," is now mandatory. 49 U.S.C. § 44901(a); *see also id.* at § 44901(c). Such screening must "take place before boarding[,] be carried out by a Federal Government employee[,]" and "be supervised by uniformed Federal personnel of the Transportation Security Administration[.]" *Id.* at § 44901(a)-(b).

- 12 -

This initial, unchallenged screening admittedly revealed "the gun box, the two guns and separate magazines and ammunition within the box." Motion at 11. According to Mr. Thompson, not only were the weapons discovered at this stage, the "CTX machine . . . showed . . . the guns were unloaded[.]" *Id.* Nevertheless, Defendant does not attack the opening of the suitcase "to reveal a locked TSA approved gun box with the conspicuous completed and signed Southwest Airlines Firearm(s) Declaration Tag . . . affixed to it." *Id.* However, given that "[t]he name on the declaration tag and the checked luggage tag matched[, t]here was nothing further" the authorities "needed to obtain from the box to assure the safety of the passengers of Flight #54 as to these firearms." *Id.*

The hearing testimony establishes the x-ray scan of the suitcase, while revealing the presence of weapons, did not disclose whether they were loaded or unloaded. Specifically, the TSA employee who was operating the CTX machine stated the image coming from the machine clearly showed firearms were in the luggage. He could not determine, though, if the pistols were loaded, and was unfamiliar with the appearance of trigger locks.[6] TSA Supervisor Wellborn also testified he could not tell from reviewing

---

[6]     Regardless of the presence and observability of trigger locks, an airline is prohibited from knowingly permitting the transport of loaded firearms. 49 C.F.R. § 1544.203(f)(1). And the testimony of Officer McClanahan suggests such locks do not entirely prevent the dangers posed by loaded guns.

the scan whether the weapons were loaded.  Similarly, Officer McClanahan was unable to make a determination as to their status.

The x-ray additionally suggested that the ammunition was not safely packaged.  Supervisor Wellborn could see the exposed tips of bullets.  He testified this circumstance required further investigation, including a physical search, to determine the safety of the items.  *Cf.* 49 C.F.R. § 175.10(a)(8) ("Ammunition clips and magazines must . . . be securely boxed.").

Moreover, the CTX machine shielding alarm had been activated. Operator Wilson explained this meant the machine was unable to penetrate some items, and what was inside those items could not be seen.  In each and every instance, stated Mr. Wilson, a shield alarm had to be resolved through further inspection.  The authorities were also unable to verify the firearms had been declared to the airline, and this understandably heightened their safety concerns.

For all of these reasons, the opening of the gun box was justifiable as an administrative security search.  To Defendant's credit, his guns were ultimately found to be unloaded.  Still, airport authorities were entitled to satisfy themselves as to the safety of transporting the container.[7]

---

[7]    To the extent Defendant suggests his implied consent to search the luggage was subject to revocation, it is noted there is no evidence he attempted such a revocation.  Further, the revocability of consent to search even checked luggage is doubtful.  *See, e.g., Okelley*, 106 F. App'x at 578; *Herzbrun*, 723 F.2d at 777.

The testimony indicates that, had the inadvertent discovery of a large sum of currency not triggered police suspicions, Mr. Thompson may have been permitted to board the next flight capable of connecting him to his destination. It had taken no more than an hour from the time the police were initially called to determine whether the checked luggage was sufficiently safe for stowage,[8] and a significant portion of the delay was occasioned by Defendant's failure to maintain in his possession the gun box key. *Cf*. 49 C.F.R. § 1544.203(f)(2)(iii) (aircraft operators not to permit firearms in checked baggage unless "only the individual checking the baggage retains the key or combination").

Importantly, even if Mr. Thompson was at some point inappropriately detained, under the circumstances here present suppression of evidence seized from the gun case would not be warranted. It was discovered as a direct result of the unchallenged x-ray and initial opening of the luggage, not due to his detention. Had Defendant never been consulted, the same safety issues would still have confronted the authorities, who could reasonably have forced open the gun box to ensure its suitability for deposit into the belly of the aircraft. Neither the guns nor the currency, the latter found as a result of the difficulty

---

[8]    Even assuming Officer McClanahan's clearing the weapons' serial numbers was improper, this action did not invalidate the search of the gun box. The testimony demonstrates the primary purpose of the search was to ensure the safety of the aircraft and its passengers.

experienced in trying to close the case,[9] depended on Mr. Thompson's presence for their discovery. "Consequently, even assuming [an unlawful detention], it would not taint the search and seizure of the" gun case. *United States v. Martell*, 654 F.2d 1356, 1361 (9th Cir. 1981).

**<u>RECOMMENDATION</u>**

Based on the foregoing, it is recommended the Motion (Doc. #59) be **DENIED.**

**ENTERED** at Jacksonville, Florida, this 6th day of March, 2008.

/s/         Howard T. Snyder
HOWARD T. SNYDER
UNITED STATES MAGISTRATE JUDGE


Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record
        and pro se parties, if any

_____

[9]    Certainly the authorities were reasonable in their desire to properly close the gun box and thereby return it to its safest configuration.